RANDY S. GROSSMAN
Acting United States Attorney
DAVID J. RAWLS
Assistant U.S. Attorney
District of Columbia Bar No. 974620
Federal Office Building
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 546-7966
Email: david.rawls@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. **'21 CV 1134 W    BLM** |
| Plaintiff, | COMPLAINT FOR FORFEITURE |
| v. | |
| $1,152,366.18 IN FUNDS FROM BENDURA BANK AG, PORTFOLIO NUMBER XX5.280, HELD IN THE NAME OF GOLDEN CASTLE TECHNOLOGY LIMITED; | |
| $53,020.18 IN FUNDS FROM BENDURA BANK AG, PORTFOLIO NUMBER XX3.200, HELD IN THE NAME OF YOUNES NASRI; | |
| Defendants. | |

By way of complaint against the Defendants, $1,152,366.18 in funds from Bendura Bank AG, portfolio number XX5.280, held in the name of Golden Castle Technology Limited, and $53,020.18 in funds from Bendura Bank AG, portfolio number XX3.200, held in the name of Younes Nasri, Plaintiff, UNITED STATES OF AMERICA alleges:

## I.     NATURE OF THE ACTION

1.     The Defendants are subject to forfeiture under Title 18, United States Code, Section 981(a)(1)(A), because the Defendants constitute any property, real or personal,

involved in a transaction or attempted transaction in violation of Title 18, United States Code, Sections 1956 and 1956(h) (Money Laundering and Conspiracy).

2. The Defendants are also subject to forfeiture under Title 18, United States Code, Section 981(a)(1)(C), as any property, real or personal, which constitutes or are derived from proceeds traceable to violations of any offense constituting a "specified unlawful activity" under Title 18, United States Code, Sections 1956(c)(7) and 1961(1), or a conspiracy to commit such offense, including Title 18, United States Code, Sections 1956 and 1956(h) (Money Laundering and Conspiracy), and violations of Title 21, United States Code, Sections 841, 846, 952, 960, and 963 (Drug Trafficking, Import/Export, and Conspiracy), and Title 18, United States Code, Section 1512(c) (Obstruction of Justice), and Title 18, United States Code, Section 371 (Conspiracy to Commit Obstruction of Justice).

3. The Defendants are further subject to forfeiture under Title 21, United States Code, Section 881(a)(6), as all moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of Subchapter I, Chapter 13 of Title 21, all proceeds traceable to such exchange, and all moneys, negotiable instruments, and securities, used or intended to be used to facilitate any violation of Subchapter I, Chapter 13 of Title 21, including violations of Title 21, United States Code, Sections 841, 846, 952, 960, and 963 (Drug Trafficking, Import/Export, and Conspiracy).

## II.          <u>JURISDICTION AND VENUE</u>

4. This Court has original jurisdiction of this civil action under Title 28, United States Code, Section 1345 because it has been commenced by the United States, and under Title 28, United States Code, Section 1355(a), because it is an action for the recovery and enforcement of a forfeiture under an Act of Congress.

5. Venue is proper in this district as to the Defendants pursuant to Title 28, United States Code, Section 1355 because some of the acts and omissions giving rise to the forfeiture of the Defendants occurred in the Southern District of California. Venue is

also proper in this district as to the Defendants pursuant to Title 21, United States Code, Section 881(j), because Younes Nasri, Vincent Ramos, Kim Augustus Rodd, Michael Gamboa, and Christopher Poquiz are charged as defendants by indictment in a criminal prosecution brought in the Southern District of California (18-CR-1404-WQH), with such violations that are bases for forfeiture of the Defendants.

## III.　　　PARTIES

6.　　Plaintiff is the United States of America.

7.　　Defendant is $1,152,366.18 in funds from Bendura Bank AG, portfolio number XX5.280, held by Younes Nasri in the name of Golden Castle Technology Limited. These funds are currently frozen in Bendura Bank AG, portfolio number XX5.280 and are subject to a restraining order issued by the Liechtenstein authorities at the request of the United States.

8.　　Defendant is $53,020.18 in funds from Bendura Bank AG, portfolio number XX3.200, held by Younes Nasri in the name of Younes Nasri. These funds are currently frozen in Bendura Bank AG, portfolio number XX3.200 and are subject to a restraining order issued by the Liechtenstein authorities at the request of the United States.

## IV.　STATEMENT OF FACTS

## A.　RACKETEERING CONSPIRACY

9.　　Beginning at least as early as 2008 and continuing up to and including March 7, 2018, within the Southern District of California and elsewhere, Vincent Ramos, Kim Augustus Rodd, Younes Nasri, Michael Gamboa, Christopher Poquiz, and others, being persons employed by and associated with PHANTOM SECURE, which was engaged in, and the activities of which affected interstate and foreign commerce, did knowingly and intentionally conspire with each other, and with others, to violate Title 18, United States Code, Section 1962(c), that is to conduct and participate, directly and indirectly, in the conduct of PHANTOM SECURE's affairs through a pattern of racketeering activity involving criminal acts indictable under the following statutes:

//

A.     Title 21, United States Code, Section 841 (Distribution and Possession with Intent to Distribute Narcotics);

B.     Title 21, United States Code, Section 952 (Importation of Controlled Substances);

C.     Title 21, United States Code, Section 846 (Conspiracy to Aid and Abet the Distribution of Controlled Substances);

D.     Title 21, United States Code, Sections 952, 960 and 963 (Conspiracy to Aid and Abet the Importation of Controlled Substances); and

E.     Title 18, United States Code, Section 1512(c) (Obstruction of Justice).

10.     It was a part of the conspiracy that Vincent Ramos, Kim Augustus Rodd, Younes Nasri, Michael Gamboa, and Christopher Poquiz each agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the activity and affairs of the PHANTOM SECURE ENTERPRISE, all in violation of Title 18, United States Code, Section 1962(d).

**B.     PHANTOM SECURE CRIMINAL ENTERPRISE**

11.     Phantom Secure Communications (PHANTOM SECURE) was a Canadian company formed in 2008 with a principal place of business in Richmond, British Columbia. PHANTOM SECURE marketed and sold stripped down and modified Blackberry devices along with a closed and encrypted communication network service to criminals and transnational criminal organizations operating in different countries, including Australia, Canada, the United States, and Mexico.

12.     PHANTOM SECURE devices were specifically designed to prevent law enforcement from actively monitoring the communications between members of transnational criminal organizations. As part of its services, PHANTOM SECURE guaranteed that messages stored on its devices could be (and would be) remotely deleted by the company if the device was seized by law enforcement or otherwise compromised.

13.     As reflected by PHANTOM SECURE's own marketing materials and other sources, PHANTOM SECURE devices were dedicated data devices housed inside a

4

Blackberry handset. PHANTOM SECURE purchased Blackberry handsets from Blackberry Limited and other Blackberry re-sellers. Whereas the standard Blackberry handset was sold to the public with the capability for voice communication, GPS navigation, camera, Internet access, and the Blackberry Messenger service, when PHANTOM SECURE received the devices, their technical team removed the internal hardware/software responsible for the GPS, camera, Internet, and voice communications. PHANTOM SECURE then installed sophisticated encryption software and routed the data through encrypted servers located in countries believed by PHANTOM SECURE management to be uncooperative with law enforcement.

14.     As further reflected by PHANTOM SECURE's own marketing materials and other sources, PHANTOM SECURE then installs Pretty Good Privacy ("PGP") encryption software and "Advanced Encryption Standard" ("AES") on top of an email program, which it routes through encrypted servers located in countries, such as Panama and Hong Kong, believed by PHANTOM SECURE to uncooperative with law enforcement. According to PHANTOM SECURE's marketing materials, there are several "advantages of having our servers and a portion of our business located in Panama," including the fact that "Panama does not cooperate with any other country's inquiries…. Panama does not consider tax evasion a crime and as such does not help other countries in their investigations."

15.     PHANTOM SECURE did not conduct business with private citizens who, unsolicited, sought to purchase a device and subscribe to its service. Instead, to purchase a device, PHANTOM SECURE required that new customers obtain a personal reference or "vouch" from an existing PHANTOM SECURE client. This restriction helped limit PHANTOM SECURE's customer base to those who use the device for criminal activity.

16.     As of 2018 there were at least ten thousand PHANTOM SECURE devices in use worldwide. For more than a decade, PHANTOM SECURE generated tens of millions of dollars in profit through its services.

//

//

17.     Vincent Ramos (RAMOS) was the founder and Chief Executive Officer (CEO) of PHANTOM SECURE. RAMOS was a citizen of Canada and a resident of Vancouver, Canada.  RAMOS was also known as "CEO" and "Business."

18.     RAMOS controlled PHANTOM SECURE's operations through, in part, the delegation of operational duties to others, including Younes Nasri, Kim Augustus Rodd, Michael Gamboa, Christopher Poquiz.

19.     Kim Augustus Rodd (RODD) was a principal at PHANTOM responsible for the distribution of PHANTOM SECURE devices in Australia and Southeast Asia. Rodd was a dual citizen of Australia and Thailand, and a resident of Phuket, Thailand. Rodd was also known as "Visith Vongthai" and "Snowstar" and "Global."

20.     Younes Nasri (NASRI) was a significant worldwide distributor of PHANTOM SECURE devices. NASRI was a citizen of Canada residing in Dubai, United Arab Emirates. NASRI was also known as "Maestro" and "Jesse."

21.     Michael Gamboa (GAMBOA) was a distributor of PHANTOM SECURE devices in the United States in Southern California. GAMBOA was a Canadian citizen residing in Los Angeles, California. GAMBOA was also known as "Chino."

22.     Christopher Poquiz (POQUIZ) was a distributor of PHANTOM SECURE devices in the United States in Southern California. POQUIZ was a Canadian citizen residing in Los Angeles, California. POQUIZ was also known as "Cad" and "Caddy."

23.     RAMOS, RODD, NASRI, GAMBOA, POQUIZ, and others, were leaders, members, and associates of a criminal organization, the PHANTOM SECURE ENTERPRISE (PHANTOM SECURE), whose members engaged in acts of drug trafficking, conspiring to aid and abet the distribution and importation of controlled substances, and obstruction of justice. Leaders, members, and associates of PHANTOM SECURE operated throughout the world, including Australia, Thailand, Canada, United Arab Emirates, and in the United States, within the State of California in the Counties of Los Angeles, Orange, and San Diego.

//

24.     PHANTOM SECURE, including its leadership, members, and associates, constituted an "enterprise," as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact, although not a legal entity. The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise. The enterprise was engaged in, and its activities affected, interstate and foreign commerce.

25.     Leaders, members, and associates of PHANTOM SECURE had defined roles in the enterprise. RAMOS, RODD, NASRI, GAMBOA, POQUIZ, and others participated in the operation and management of the enterprise.

26.     <u>Administrators</u> were PHANTOM SECURE front office staff who had physical control of the PHANTOM SECURE network and could initiate new subscriptions, remove accounts, remotely delete (i.e., wipe) and reset devices. RAMOS, as the Chief Executive Officer, was the key administrator. RODD also served in a controller-type role for the company.

27.     <u>Distributors</u> coordinated agents and resellers of PHANTOM SECURE devices, received payments for ongoing subscription fees, sent associated funds (minus personal profit) back to the parent company, and provided second-level technical support. The distributors communicated directly with PHANTOM SECURE administrators. NASRI, POQUIZ, and GAMBOA were all distributors for PHANTOM SECURE.

28.     <u>Agents</u> physically sourced and engaged with new customers to sell and deliver devices with initial subscriptions. The agents earned profit on the sale of the handset only and provided first-level technical support to their small group of customers.

**B.     OBJECTIVES OF THE PHANTOM SECURE CRIMINAL ENTERPRISE**

29.     PHANTOM SECURE's objectives included the following:

A.     To create, maintain and control a method of secure communication to facilitate the importation, exportation, and distribution of illegal drugs into Australia, Asia, Europe, and North America, including the United States and Canada, and the laundering of proceeds of such drug trafficking conduct;

B.      To obstruct investigations of drug trafficking and money laundering organizations by creating, maintaining, and controlling a system whereby PHANTOM SECURE would remotely delete evidence of such activities;

C.      To enrich the leaders, members, and associates of the enterprise by taking payment from the sale of each PHANTOM SECURE device;

D.      To promote and enhance the reputation and standing of PHANTOM SECURE and its leaders, members, and associates;

E.      To preserve and protect PHANTOM SECURE's profits and client base through acts of money laundering;

F.      To protect PHANTOM SECURE and its leaders, members, and associates from detection, apprehension, and prosecution by law enforcement;

G.      To avoid detection of PHANTOM SECURE's illicit conduct by, among other things, laundering its illegal proceeds, communicating with encrypted devices, and transferring illegally-obtained funds into cryptocurrency, specifically, Bitcoin;

H.      To evade law enforcement by, among other things, maintaining the organization's technical infrastructure outside the United States and Canada; and

I.      To enhance its power and financial profits by promoting PHANTOM SECURE's activities with customers and potential customers.

**C.      MANNER AND MEANS OF THE PHANTOM SECURE CRIMINAL ENTERPRISE**

30.      The means and methods by which RAMOS, RODD, NASRI, GAMBOA, POQUIZ, and other members and associates of PHANTOM SECURE conducted and participated in the affairs of the enterprise included, but were not limited to, the following:

A.      PHANTOM SECURE Administrators operated the PHANTOM SECURE NETWORK, which used PHANTOM SECURE devices to send and receive encrypted messages. To stay outside of the reach of law enforcement, PHANTOM SECURE maintained its servers in Panama and Hong Kong, and used proxy servers to further disguise the physical location of its servers.

8

B.    PHANTOM SECURE Distributors provided PHANTOM SECURE devices to their clients (i.e. "Executives") and collected a subscription fee of approximately $2,000 per six-month period. To impede law enforcement's ability to penetrate the PHANTOM SECURE network, the Administrators, Distributors, and Agents of PHANTOM SECURE required a personal reference (i.e. a vouch) from existing clients before selling a device and its services to a new client.

C.    PHANTOM SECURE Administrators, Distributors, and Agents employed the use of code words, such as "Executives," to describe clients it knew or had reason to know participated in illegal activities, including international drug trafficking.

D.    PHANTOM SECURE Administrators, Distributors, Agents, and "Executives" strove to achieve shared anonymity, in order to evade law enforcement and escape the other consequences of their criminal activities. To that end, PHANTOM SECURE Administrators, Distributors, Agents, and "Executives" remained anonymous even to each other. PHANTOM SECURE Administrators, Distributors, and Agents did not request, track or record their clients' real names, and interacted only via username, email handles, or nicknames.

E.    PHANTOM SECURE's Administrators, Distributors, Agents, and "Executives" distributed and facilitated the distribution of controlled substances, including heroin, cocaine, and methamphetamine, using PHANTOM SECURE devices.

F.    PHANTOM SECURE Administrators, Distributors, and Agents obstructed law enforcement by deleting (i.e. wiping) devices that had been seized by law enforcement to destroy evidence that the devices contained. PHANTOM SECURE Administrators, Distributors, and Agents also suspended service and deleted the contents of devices if they suspected law enforcement or an informant was using the Phantom SECURE device as part of an investigation.

G.    PHANTOM SECURE Administrators, Distributors, and Agents facilitated the illegal activities of its "Executive" clients, including drug trafficking and money laundering.

H.    PHANTOM SECURE Administrators, Distributors, and Agents used digital currencies, including Bitcoin, to facilitate the illegal transactions to protect the membership's anonymity, and to facilitate the laundering of the membership's ill-gotten gains. PHANTOM SECURE Administrators, Distributors, and Agents also set up and maintained shell companies to hide the proceeds generated by selling its encryption services and devices.

**D.    RELATED CRIMINAL CASE: RAMOS, NASRI & PHANTOM SECURE MEMBERS CHARGED BY CRIMINAL INDICTMENT WITH RICO CONSPIRACY & CONSPIRACY TO DISTRIBUTE COCAINE**

31.    **Indictment.** RAMOS, RODD, NASRI, GAMBOA, and POQUIZ were charged by criminal Indictment in the Southern District of California on March 15, 2018 in criminal case number (18-CR-01404-WQH) with violations of: (Count One) Title 18, United States Code, Section 1962(d) – Racketeering Conspiracy to Conduct Enterprise Affairs (RICO Conspiracy); and (Count Two) Title 21, United States Code, Sections 841(1)(1) and 846 – Conspiracy to Aid and Abet the Distribution of Cocaine.

**E.    RAMOS' CONVICTION, ADMISSIONS & CRIMINAL FORFEITURE**

32.    **RAMOS' Conviction.** On October 2, 2018, RAMOS pled guilty to Racketeering Conspiracy in violation of Title 18, United States Code, Section 1962(d) as charged in Count 1 of the Indictment.

33.    As part of his guilty plea, RAMOS admitted that:

a.    PHANTOM SECURE was an enterprise. That is, PHANTOM SECURE was an association and a group of individuals associated-in-fact for the purpose of (1) aiding and abetting the importation, exportation, and distribution of illegal drugs throughout the world; (2) obstructing justice through the destruction and concealment of evidence from law enforcement; and (3) money laundering.

b.    The PHANTOM SECURE enterprise included co-defendants RODD, NASRI, and others.

//

c.      The organizational structure of the PHANTOM SECURE enterprise included individuals in the following roles, among others:

1.      <u>Administrators</u>: Administrators were PHANTOM SECURE corporate executives and front office staff who had physical control of the PHANTOM SECURE network, PHANTOM SECURE's books and records, and corporate operations. Administrators could initiate new subscriptions, remove accounts, remotely delete (wipe), and reset devices.

2.      <u>Distributors</u>: Distributors coordinated agents and resellers of PHANTOM SECURE devices, received payments for ongoing subscription fees, sent associated funds (minus personal profit) back to the parent company, and provided second-level technical support. Distributors communicated directly with PHANTOM SECURE administrators.

3.      <u>Agents</u>:  Agents physically sourced and engaged with new customers to sell and deliver PHANTOM SECURE devices with initial subscriptions. The agents earned profit on the sale of the handset only, and provided first level technical support to their small group of customers.

d.      Through PHANTOM SECURE, RAMOS and others facilitated the importation, exportation, and distribution of wholesale quantities of (a) cocaine; (b) heroin; and (c) methamphetamine throughout the world, including the United States, Australia, Mexico, Canada, Thailand, and Europe. It was reasonably foreseeable to RAMOS that as part of this conspiracy PHANTOM SECURE's customers would and did use PHANTOM SECURE devices to coordinate the importation, exportation, and distribution of more than 450 kilograms of cocaine.

e.      Through PHANTOM SECURE, RAMOS and others manufactured and sold devices to send and receive encrypted messages. To stay outside the reach of law enforcement of the United States, RAMOS and other maintained PHANTOM SECURE's servers in Panama and Hong Kong, and used virtual proxy servers to further disguise the physical location of its servers.

f.     Through PHANTOM SECURE, to impede law enforcement, RAMOS and others required a personal reference (i.e., a vouch) from existing clients before selling a device and its services to a new customer.

g.     Through PHANTOM SECURE, RAMOS and others employed the use of code words, such as "executives," to describe clients it knew or had reason to know participated in illegal activities, including international drug trafficking.

h.     Through PHANTOM SECURE, RAMOS and others strove to remain as anonymous as possible to evade law enforcement and avoid other consequences of their criminal activities. PHANTOM SECURE Administrators, Distributors, and Agents did not request, track, or record their clients' real names, and interacted only via username, email handles, or nicknames.

i.     Through PHANTOM SECURE, RAMOS and/or others obstructed law enforcement by deleting (i.e., wiping) devices that had been seized by law enforcement to destroy evidence that the devices contained. PHANTOM SECURE Administrators, Distributors, and Agents also suspended service and deleted the contents of devices if it was suspected that law enforcement or an informant was using the PHANTOM SECURE device as part of a law enforcement investigation.

j.     Through PHANTOM SECURE, RAMOS and/or others used digital currencies, including Bitcoin, to facilitate illegal transactions on the website, to protect the membership's anonymity, and to facilitate the laundering of the PHANTOM SECURE enterprise's ill-gotten gains. PHANTOM SECURE Administrators, Distributors, and Agents also set up and maintained shell companies to hide the proceeds generated by selling PHANTOM SECURE's encryption devices and services.

k.     PHANTOM SECURE was engaged in interstate and foreign commerce, and in some way affected interstate and foreign commerce.

l.     RAMOS was associated with PHANTOM SECURE, in that RAMOS was the Chief Executive Officer of PHANTOM SECURE and had decision-making authority over PHANTOM SECURE's operations throughout the world.

m.      Beginning at least as early as January 2008 and continuing up to and including March 2018, RAMOS agreed with others, including RODD, NASRI, and others to conduct PHANTOM SECURE's affairs through a pattern of racketeering activity: RAMOS' agreement with his co-conspirators included the understanding  that PHANTOM SECURE would be engaged in multiple racketeering activities on a nearly daily basis for the benefit of PHANTOM SECURE, including (i) facilitating the importation, exportation, and distribution of wholesale and retail quantities of illegal narcotics, including cocaine, heroin, and methamphetamine; (ii) laundering of the illegal proceeds of the PHANTOM SECURE Enterprise; and (iii) obstructing justice through the deletion and concealment of evidence from law enforcement.

n.      RAMOS became a member of the conspiracy knowing the illegal objects of the conspiracy and intending to help accomplish them.

o.      As CEO of PHANTOM SECURE, with decision-making authority over other administrators, distributors, and agents operating throughout the world, RAMOS was an organizer and leader of the PHANTOM SECURE Enterprise that involved more than five participants and was otherwise extensive.

34.      RAMOS further admitted and agreed as part of his guilty plea to forfeit to the United States $80,000,000 in the form of a money judgment against RAMOS. RAMOS admitted and agreed the $80,000,000 represents the net proceeds he received from conspiring to commit the racketeering activities of the PHANTOM SECURE Enterprise.

35.      RAMOS agreed to the forfeiture of, among numerous other seized assets, the following:

a.      All money, funds and credits on deposit in Allied Irish Banks Plc. account number IE39AIBK93006726793263, held in the name of Vincent Ramos and/or Phantom Secure Technology Ltd.

b.      All money, funds and credits on deposit in Allied Irish Banks Plc. account number IE49AIBK93338488125032, held in the name of Vincent Ramos and/or Phantom Secure Technology Ltd.

36.   **RAMOS' Sentence & Order of Forfeiture.** On May 28, 2019, RAMOS was convicted and sentenced to one-hundred eight (108) months of custody, and three (3) years of supervised release. RAMOS was also ordered to forfeit a money judgment of $80,000,000 in criminal proceeds obtained from his Racketeering Conspiracy conviction, including specific assets such as all money, funds and credits on deposit in RAMOS' Allied Irish Banks Plc. account numbers, IE39AIBK93006726793263 and IE49AIBK93338488125032, held in the name of Vincent Ramos and/or Phantom Secure Technology Ltd.

## F.   CONSPIRACY TO AID AND ABET THE DISTRIBUTION OF CONTROLLED SUBSTANCES

37.   Beginning at least as early as 2008 and continuing up to and including March 7, 2018, within the Southern District of California and elsewhere, RAMOS, RODD, NASRI, GAMBOA, POQUIZ, did knowingly and intentionally conspire with each other and others to aid and abet the distribution of Schedule I and II Controlled Substances, including, cocaine, methamphetamine, and heroin in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

## G.   CRIMINAL ACTS & EXAMPLES OF PHANTOM SECURE CRIMINAL ENTERPRISE's DRUG TRAFFICKING CUSTOMERS & CO-CONSPIRATORS THAT SUPPORT FORFEITURE

**PERSON 1—PHANTOM SECURE Distributor**

38.   Person 1, whose identity is known to the Government, was a prominent distributor of PHANTOM SECURE devices.

39.   Person 1, along with PHANTOM SECURE, tried to evade law enforcement and avoid the consequences of its criminal activity through anonymity. Person 1 and PHATOM SECURE did not request, track, or record their client customers' real names, or other identifying information. Instead, Person 1 and PHANTOM SECURE interacted with their clients through username, email handles, or nicknames. Once a new client-customer initiated service with PHANTOM SECURE, that individual self-assigned an anonymous,

custom email handle and was assigned a domain owned by PHANTOM SECURE, thereby creating the client-customer's PHANTOM SECURE email address.

40.     Person 1 and PHANTOM SECURE also attempted to limit the distribution of handsets to those individuals associated with organized crime.

41.     Person 1 and PHANTOM SECURE guaranteed client-customers that PHANTOM SECURE would remotely delete messages on PHANTOM SECURE devices that were seized by law enforcement or otherwise compromised.

42.     Person 1 met with RAMOS in Los Angeles, California. At that meeting RAMOS told Person 1 to refer to PHANTOM SECURE's client-customers as "executives" rather than "criminals" in order to conceal PHANTOM SECURE's clients' true identities and occupations.

43.     Also during the meeting in Los Angeles, Person 1 asked RAMOS to visit Person 1 in Australia. RAMOS, however, responded that he would be arrested if he traveled to Australia because he was the CEO of PHANTOM SECURE. RAMOS further advised Person 1 that he did not want a lot of people to know that he was the CEO of PHANTOM SECURE.

44.     Soon after that meeting, Person 1 communicated via text messages with RAMOS. The text message exchange included the following:[1]

a.     RAMOS stated, "But if we turned [in]to executives we would be the top executives out there lol, but not gonna lie have so much exec blood running through. Former execs lol."

b.     Person 1 responded, "Oh if we turned back [into] exec then it wouldn't be a problem[,] this business opens so many doors."

c.     RAMOS replied, "Yes bro…we are all former execs, We gon[na] do big things…I'm constantly networking."

45.     In August 2017, Person 1 and RAMOS used the PHANTOM SECURE network to discuss PHANTOM SECURE's response to law enforcement inquiries.

---

[1] Law enforcement officers conducing this investigation have added some bracketed terms and language to some of the conversations included in this Complaint in order to provide context to the reader.

Specifically, Person 1 and RAMOS shared screenshots and discussed a conversation that took place between two other unknown users of PHANTOM SECURE. The text message exchange included the following:

a.  "Word of caution. There is a strong rumour that [b]osspgp sales [one of PHANTOM SECURE's competitor encrypted networks] apparently been working with police and give out location and details of clients. A few of my mates got pulled in. I wiped over 8 accounts today coz they had dealings with boss pgp emails. Spread word to ur boys whoever been dealing with boss pgp should be wiping their acc[ount]s."

b.  Person 1 received the message and forwarded the message and "rumour" to RAMOS.

c.  RAMOS replied, "boss pgp" was not a "government asset," and that "[a]uthorities one day will ask you [Person 1] to cooperate to help them. But not like you will. Same sort of thing."

d.  RAMOS reminded Person 1 that "you run a proper business…if any authorities wanted to have a conversation with your or me…we run a professional business."

46.  In October 2017, Person 1 travelled to Phuket, Thailand to meet with RODD. During that meeting, RODD and Person 1 discussed the following:

a.  Person 1 and RODD discussed PHANTOM SECURE's devices being used to facilitate large drug trafficking imports into Australia. Person 1 stated, "if he wants the contract [drug imports], he has to use this phone."

b.  RODD asked, "You mean work [drug] wise?"

c.  Person 1 replied, "Yea, if he wants to work he has to use this phone."

d.  RODD replied, "that is how Phantom was started in Oz [Australia] really."

47.  Also during that meeting, Person 1 and RODD discussed PHANTOM SECURE's user base in Australia. RODD explained, "[A]t our peak, we were 11,000—11 one half thousand [in] Australia. [T]hat's how many cunts [criminals] there are." RODD

//

16

added that he personally "has got 3 ½ thousand in Oz [Australia]" and "[NASRI] has 3 ½ in Oz [Australia] and then probably another thousand in Hong Kong, Indonesia."

48.    RODD also explained to Person 1 that NASRI is a significant distributor of PHANTOM SECURE devices who knowingly provides them to criminal organizations.

49.    Person 1 learned from RODD that PHANTOM SECURE launders its criminal proceeds and protects its members' anonymity by using cryptocurrencies, including Bitcoin, and shell companies.

**PERSON 2—Drug Trafficking Customer of PHANTOM SECURE**

50.    Person 2, whose identity is known to the Government, was a client-customer of PHANTOM SECURE.

51.    Person 2 operated a criminal enterprise that engaged in international drug trafficking and other criminal activity between 2012 and January 2016. Person 2 was arrested in 2015 and later convicted for RICO Conspiracy and Conspiracy to Distribute Cocaine and Methamphetamine and sentenced to 255 months of custody.

52.    Person 2 paid between $2,000 and $3,000 for six-month subscriptions for PHANTOM SECURE devices and network services.

53.    Person 2 and members of Person 2's international drug trafficking organization used PHANTOM SECURE devices to communicate and coordinate their criminal activities. Person 2 and members of Person 2's international drug trafficking organization used the PHANTOM SECURE devices and network services as they were specifically designed, marketed, and distributed to transnational criminal organizations, specifically drug trafficking organizations.

54.    Person 2 was informed that PHANTOM SECURE would remotely delete messages on PHANTOM SECURE devices seized by law enforcement or otherwise compromised.

55.    Person 2 was introduced to Person 3. Person 3, whose identity is known to the Government, identified himself/herself as a drug trafficker and interested client-customer of PHANTOM SECURE to Person 2.

56.     Person 2 required that Person 3's bona fides be verified by PHANTOM SECURE. PHANTOM SECURE later provided Person 2 with verification. Person 2 then wrote to Person 3: "I was more worried about u – feel better now seeing u a 2nd time – and finding out from my Phantom [Secure] guys that you've been with the company for a year…All good, now let's go earn."  Person 2 used the term "earn" to mean "mutually conduct drug transactions, thereby generating profit for both parties."

57.     Person 2 used PHANTOM SECURE devices over the course of several years to move hundreds of kilograms of cocaine per month from Mexico through the United States, ultimately destined for Canada and Australia. Person 2 used a PHANTOM SECURE device to coordinate and complete each of these drug transactions.

58.     For example, between July 2015 and August 2015, Person 2 and Person 3 discussed and confirmed the details of a transaction for five (5) kilograms of cocaine. Person 2 and Person 3 agreed that the delivery would take place at a hotel in Del Mar, California. Person 2 stated that he would send his associate, Person 4, whose identity is known to the Government, to make the cocaine delivery.

59.     At the agreed upon date in August 2015, Person 4 arrived at the prearranged hotel in Del Mar, California and gave Person 3 one (1) kilogram of cocaine. After testing a sample and confirming that it was cocaine, Person 3 gave Person 4 $90,000. Person 4 then provided Person 3 the remaining four (4) kilograms of cocaine.

60.     In a series of PHANTOM SECURE messages with Person 2, Person 3 confirmed that the delivery of five (5) kilograms of cocaine had occurred as planned.

61.     Person 2 later used his/her PHANTOM SECURE device to arrange for five (5) kilograms of methamphetamine to be delivered to Person 3 in September 2015.

62.     Also in September 2015, Person 2 and Person 2's associates communicated over PHANTOM SECURE devices provided by GAMBOA for the delivery of over 135 kilograms of cocaine from Los Angeles, California to Canada. Following Person 2's arrest, PHANTOM SECURE attempted to wipe Person 2's PHANTOM SECURE device.

63.     In August 2015, Person 2 and his Australian conspirators used PHANTOM

SECURE devices provided by GAMBOA to coordinate a shipment of ten (10) kilograms of cocaine from the United States to Australia. The shipment was later seized by the Australian Border Force.

64. In May 2017, the Fontana, California Police Department seized 71 kilograms of cocaine from GAMBOA.

65. GAMBOA and POQUIZ were PHANTOM SECURE distributors in Southern California that knew that Person 2 used PHANTOM SECURE devices to conduct illegal drug transactions. GAMBOA met with Person 2 on several occasions and sold Person 2 approximately three (3) devices several times a year for several years.

66. POQUIZ informed Person 2 that POQUIZ used his Canadian connections to transport cocaine from the United States to Canada.

**PERSON 5—Drug Trafficking Customer of PHANTOM SECURE**

67. Person 5, whose identity is known to the Government, was also a drug trafficking client-customer of PHANTOM SECURE. Person 5 took control of the operation of Person 2's criminal enterprise after Person 2 was arrested in 2015.

68. Person 5 used PHANTOM SECURE's devices and network service to conduct international drug trafficking activity.

69. Person 5 paid between $2,000 and $3,000 for six-month subscriptions for PHANTOM SECURE devices and network services.

70. In March 2017, Person 5 loaded multiple duffle bags into a large truck at known drug load drop point in Los Angeles, California. After the truck left the area, local police stopped the truck and seized approximately 194 kilograms of cocaine.

71. A PHANTOM SECURE device was seized from Person 6. Law enforcement confirmed that the PHANTOM SECURE device had been used to coordinate the receipt and delivery of the cocaine. The PHANTOM SECURE device was then remotely erased within hours of Person 6's arrest.

//

//

**PERSON 7—Drug Trafficking Customer of PHANTOM SECURE**

72.    Person 7, whose identity is known to the Government, was a client-customer of PHANTOM SECURE and a member of Person 2 and Person 5's international drug trafficking organization.

73.    Person 7 paid between $2,000 and $3,000 for six-month subscriptions of PHANTOM SECURE devices and services.

74.    In March 2016, Person 7 purchased two (2) PHANTOM SECURE devices from POQUIZ. Person 7 indicated to POQUIZ that one of the devices was going to be used in Panama to transfer "work" [drugs]. Person 7 and POQUIZ had the following conversation:

a.    Person 7 stated that law enforcement was successfully breaking into iPhones and asked about PHANTOM SECURE's security. Person 7 asked about what happens if a PHANTOM SECURE device "fell into somebody else's hands?"

b.    POQUIZ replied, "We can always send a message out to zap, like, it'll fry all the information on the, like, a distress message." POQUIZ further stated that "some people" are attempting to use "brute force attacks" on seized devices. POQUIZ stated that if "someone" did attempt a brute force attack, the device will wipe itself after ten (10) attempts.

75.    In May 2016, POQUIZ met with Person 7. During that meeting, POQUIZ indicated that for the purpose of shipping narcotics, he could introduce Person 7 to multiple individuals in the "transportation business."

**RAMOS Meets With Undercover Agents Posing As Drug Traffickers**

76.    RAMOS met with Undercover Agents (UCs) in Las Vegas, Nevada in February 2017. The UCs indicated to RAMOS that he was a high-ranking member of a transnational drug trafficking organization seeking secure communications and data deletion services to facilitate an expansion of their drug trafficking activities in South America and Europe.

//

77.     At that meeting RAMOS explained to UCs that PHANTOM SECURE was built specifically for the purpose of drug trafficking:

a.      UCs: "Three of my main guys are in prison."

b.      RAMOS: "Mhm."

c.      UCs: "I lost, like, 50 kilos coming out from Columbia."

d.      RAMOS: "Okay. You don't have to tell me that, but it's okay."

e.      UCs: "Yea, well, We're all friends."

f.      RAMOS: "Just saying it out loud."

g.      UCs: "It's there's a lot of exposure right here. There's a lot."

h.      RAMOS: "Of course. That's—"

i.      UCs: "You know, we don't know you."

j.      RAMOS: "Of course. That's what I'm saying. You don't know me. But, yea, that's exactly what I'm saying, right. We made it-we made it specifically for this [drug trafficking] too."

k.      RAMOS further stated to UCs that he was confident in the PHANTOM SECURE product and he assured UCs that PHANTOM SECURE's technology would not be compromised.

l.      RAMOS also discussed with UCs drugs lost in transit. RAMOS stated, "I've seen and heard from other people just 'cause I'm in this business. That it is, um where people, when it happens [drugs are seized by law enforcement] to people all of, a lot of informants in, somebody already inside. Ninety-nine percent of the times."

m.      UCs told RAMOS that GPS functionality on a PHANTOM SECURE device was necessary to facilitate targeted murders of criminal associates suspected of betraying his organization. RAMOS replied, "Right, right, right, right."

n.      Later in the conversation, RAMOS told UCs that PHANTOM SECURE's encryption could not be "hacked" and that the primary vulnerability of this type of communication was an "informant." RAMOS stated, "from what I experienced it's always cooperation, ya know."  UCs replied, "Which goes back to the GPS issue." RAMOS

21

responded, "Yea, it does."

78.    UCs also asked RAMOS what action the transnational criminal organization should take if one of its members was "pinched"? The following conversation took place:

a.    UCs: "What is it that you recommend. What's the first thing we should if we get word that someone got pinched and we need to just kind of—

b.    RAMOS: "You'd probably want to—"

c.    UCs: "Having them fall of the radar"

d.    RAMOS: "You'd—you'd want, um, send a wipe command to his device."

e.    UCs: "A lot of concern from a lot of people here, we have that, ya know, I guess reassurance that they are gonna be able to be remotely taken care of."

f.    RAMOS: "Right. But I but the only thing is when you're saying the remotely wiped, it has to have a connection to the network. Because what they do now with that they have a Faraday bag. You can put the device into the bag and it does not emit any signals if you put it into like, a lab to avoid wipes."

g.    UCs: "Who has that?"

h.    RAMOS: "What I'm saying, the authorities, the "unfriendlies" [law enforcement] do.

79.    RAMOS contacted Person 1 on numerous occasions to inquire whether UCs were using PHANTOM SECURE devices and whether UCs were satisfied with the service.

80.    RAMOS told Person 1 that RAMOS was working to resolve the GPS issue for UCs as UCs had explained the need to track the employees of UCs' criminal organization.

## PERSON 8—NASRI Provided PHANTOM SECURE Devices To Large Scale Drug Trafficking Organization

81.    Person 8, whose identity is known to the Government, was a large-scale drug trafficker convicted of drug trafficking in Australia.

82.    NASRI provided Person 8 with PHANTOM SECURE devices knowing that Person 8 was involved in large scale drug trafficking and that those PHANTOM SECURE

devices were used to operate Person 8's drug trafficking organization.

**PERSON 9—Purchased PHANTOM SECURE Devices From GAMBOA**

83.    In September 2014, Person 9, whose identity is known to the Government, purchased three (3) PHANTOM SECURE devices from GAMBOA. Person 9 and GAMBOA had the following conversation:

a.    Person 9 contacted GAMBOA and asked GAMBOA to wipe the PHANTOM SECURE devices. Person 9 stated, "90 kilograms of cocaine were seized in the border area."

b.    GAMBOA replied, "Don't talk about that on the phone, I just with [PHANTOM SECURE devices], I don't deal with that shit."

c.    Person 9 then stated, "my boss wants to know if you get these cleaned the fucking cope not going to be able to read any of the messages right?"

d.    GAMBOA replied, "No that's why we do emails because it doesn't stick on the PHANTOM SECURE device…it does directly into our server so nothing is on the phone it will be a blank phone."

e.    Person 9 then asked, "Ok when can you wipe these by?"

f.    GAMBOA responded, "They'll be wiped in 15 minutes so you guys don't have to worry."

g.    Person 9 then asked for new PHANTOM SECURE devices.

h.    GAMBOA replied, "Yeah just give me two days in advance just give me a call."

**PERSON 10—Customer's Request to Wipe PHANTOM SECURE Device Due To Drug Trafficking Bust**

84.    Person 10, whose identity is known the Government, was a client-customer of PHANTOM SECURE and indicated to PHANTOM SECURE that Person 10 was a drug trafficker.

85.    In 2015, Person 10 wanted to purchase PHANTOM SECURE devices.

86.    During the vetting process, Person 10 asked PHANTOM SECURE if it was

safe to send messages that explicitly discussed drug trafficking, using the following examples, "cocaine coming up" and "sending MDMA to Montreal." PHANTOM SECURE's employee replied that speaking explicitly was "totally fine" because the servers were "based in Panama" and "no one has access" to "our servers."

87.    Later, Person 10 told PHANTOM SECURE that an associate of Person 10's drug trafficking organization was arrested and requested that PHANTOM SECURE delete an associate's PHANTOM SECURE device. In response to this request, the following conversation took place:

a.    Person 10: "So, he picked up the load [of drugs] and I think he's been arrested and I need, there's a lot of evidence and fuckin' shit on my Blackberry."

b.    Phantom Secure: "Yeah."

c.    Person 10: "I need the evidence gone, ASAP."

d.    PHANTOM SECURE: "You wanna wipe both of them?"

e.    Person 10: "Yes"

f.    PHANTOM SECURE: "Okay then…."

g.    Person 10: "Oh, you're a lifesaver."

h.    PHANTOM SECURE: "One sec."

i.    Person 10: "And, but the thing is, cops can't access it, right?

j.    PHANTOM SECURE: "They can't even access that anyways, yeah."

**H.    RAMOS, NASRI, & PHANTOM SECURE CONPSIRED TO AND COMMITTED MONEY LAUNDERING VIOLATIONS WITH OVER $80 MILLION IN CRIMINAL PROCEEDS OBTAINED FROM DRUG & MONEY LAUNDERING & OBSTRUCTION OF JUSTICE VIOLATIONS**

88.    Between 2014 and March 2018, PHANTOM SECURE generated over $80,000,000 in criminal proceeds obtained from the sale of PHANTOM SECURE devices and network subscriptions.

89.    The $80,000,000 constitutes criminal proceeds obtained from and traceable to violations of Title 21, United States Code, Sections 841, 846, 952, 960, and 963 (Drug

Trafficking, Import/Export, and Conspiracy), and Title 18, United States Code, Section 1512(c) (Obstruction of Justice), and Title 18, United States Code, Section 371 (Conspiracy to Commit Obstruction of Justice), and Title 18, United States Code, Sections 1956 and 1956(h) (Money Laundering and Conspiracy).

90.    Title 18, United States Code, Sections 1956(c)(7) and 1961(1) define "specified unlawful activity" to include Title 21, United States Code, Section 841 (Distribution and Possession With Intent To Distribute Narcotics), and Title 21, United States Code, Section 846 (Conspiracy To Aid and Abet The Distribution of Controlled Substances), and Title 21, United States Code, Section 952 (Importation of Controlled Substances), and Title 21, United States Code, Sections 952, 960 and 963 (Conspiracy to Aid and Abet the Importation of Controlled Substances), and Title 18, United States Code, Section 1512 (Obstruction of Justice), and Title 18, United States Code, Sections 1956 and 1956(h) (Money Laundering and Conspiracy).

91.    Between 2014 and at least March 2018, RAMOS, NASRI, RODD, GAMBOA, POQUIZ, and other members and associates of PHANTOM SECURE, knowingly and intentionally conspired and agreed with each other, and with others, to commit certain offenses under Title 18, United States Code, Section 1956, in that they conducted and attempted to conduct financial transactions affecting interstate commerce, which transactions involved the proceeds of specified unlawful activity, that is:

a.    felonious drug trafficking, import/export, and conspiracy violations of Sections 841, 846, 952, 960, 963 of Title 21, and knowing the financial transactions represented the proceeds of some form of unlawful activity, with (1) the intent to promote the carrying on of such specified unlawful activity, and (2) knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of such specified unlawful activity;

b.    promotion money laundering in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i), and concealment money laundering in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i), and knowing the financial transactions

represented the proceeds of some form of unlawful activity, with (1) the intent to promote the carrying on of such specified unlawful activity, and (2) knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of such specified unlawful activity;

c.    obstruction of justice violations of Title 18, United States Code, Section 1512(c), knowing the financial transactions represented the proceeds of some form of unlawful activity, with (1) the intent to promote the carrying on of such specified unlawful activity, and (2) knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of such specified unlawful activity;

and did so all in violation of Title 18, United States Code, Section 1956(h).

**I.    RAMOS & PHANTOM SECURE'S MONEY LAUNDERING ACTIVITIES**

92.    In March 2018, RAMOS acknowledged the following details of PHANTOM SECURE's financial activity:

a.    RAMOS stated that he was the sole owner of PHANTOM and confirmed that all of the international bank accounts related to PHANTOM SECURE and/or RAMOS were set up to move money exclusively generated from the global sales and operation of PHANTOM SECURE devices. RAMOS stated that no other source of funds were commingled in the accounts.

b.    RAMOS stated that PHANTOM SECURE related bank accounts were opened by him or opened by third parties at his direction, and that proceeds from the global sale of devices flowed to him through the network of international bank accounts that he set up.

c.    RAMOS confirmed that PHANTOM SECURE bank accounts were located in the United States, Canada, Hong Kong, Singapore, the Philippines, and Ireland.

d.    RAMOS stated that he hired Person 11 as a consultant to help him set up companies in Ireland for the purposes of receiving PHANTOM SECURE proceeds and providing tax shelters.

//

e.      RAMOS acknowledged that criminals and transnational criminal organizations were users of PHANTOM SECURE devices. At that time, RAMOS also claimed that there were legitimate users of PHANTOM SECURE devices but did not identify any.

f.      RAMOS stated that he withdrew money from bank accounts as he needed. RAMOS stated that he paid approximately $200,000 per month for SIM cards for the PHANTOM SECURE devices, and that he paid tens of thousands of dollars each month to cover the PHANTOM SECURE server expenses. RAMOS also stated that he employed four office staff to run the PHANTOM SECURE office in Canada and that they were paid through regular payroll.

## J.      NASRI & PHANTOM SECURE USED SHELL COMPANIES TO LAUNDER CRIMINAL PROCEEDS

93.      NASRI formed shell companies and accounts to launder PHANTOM SECURE'S criminal proceeds. PHANTOM SECURE established and maintained shell companies to deposit and funnel the criminal proceeds obtained from the sale of PHANTOM SECURE devices and network subscriptions. These shell companies included companies and accounts formed by NASRI such as: SecureComm Ltd., DSL Data Service Logistics Limited, Encryptcomm Ltd., and Golden Castle Technology Ltd.

94.      SecureComm Ltd. (SecureComm).  NASRI established SecureComm in Hong Kong in 2011. NASRI was listed as the sole director of SecureComm.

95.      DSL Data Service Logistics Limited (DSL Data). NASRI established DSL Data in Hong Kong in 2012. NASRI was listed as the sole director of DSL Data.

96.      Encryptcomm Ltd. (Encryptcomm). This company was held by NASRI in the United Arab Emirates.

97.      NASRI opened and maintained multiple bank accounts held in the names of SecureComm and DSL Data, at HSBC Bank and Hang Seng Bank, in Hong Kong.

98.      NASRI also opened and maintained a bank account in the name of SecureComm at Overseas Chinese Bank in Singapore.

99.     <u>Golden Castle Technology Ltd. (Golden Castle).</u> Golden Castle Technology Limited was a British Virgin Island Entity. The registered address was P.O. Box 4519, 30 de Castro Street, Wickhams Cay 1, Road Town VG1110. Bendura Bank AG account documents regarding the business activities and purpose of Golden Castle Technology Ltd. state that the company "is the licensee of a virtual private network online communication solution, Phantom Secure Technology Ltd. is the licensor. The clients of Golden Castle Technology resell the –PS-Tech technology. Golden Castle Technology Ltd. also provides training and services to wholesalers."

100.     **GOLDEN CASTLE ACCOUNT.** NASRI opened and maintained a bank account held in the name of Golden Castle Technology, in Portfolio Number XX5.280, at Bendura Bank AG, in Liechtenstein (GOLDEN CASTLE ACCOUNT). Bendura Bank AG account opening documents list NASRI as the only authorized representative on the GOLDEN CASTLE ACCOUNT.

101.     **YOUNES NASRI ACCOUNT.** NASRI opened and maintained a bank account held in the name of YOUNES NASRI, in Portfolio Number XX3.200, at Bendura Bank AG, in Liechstenstein (YOUNES NASRI ACCOUNT).

**K.     SECURECOMM, DSL DATA & ENCRYPTCOMM DEPOSTED OVER $19,000,000 IN CRIMINAL PROCEEDS TO THE <u>GOLDEN CASTLE ACCOUNT</u>**

102.     NASRI was one of the largest distributors of PHANTOM SECURE devices in the world.

103.     In 2018 there were approximately 10,000 PHANTOM SECURE devices in use worldwide.

104.     NASRI provided PHANTOM SECURE devices and network services to drug traffickers and other criminal organizations in exchange for a subscription fee of between $2,000 and $3,000 per six-month period.

105. Drug traffickers and other criminal organizations paid NASRI and PHANTOM SECURE for these PHANTOM SECURE devices and network subscriptions

28

by transferring criminal proceeds to accounts held by NASRI's shell companies, SecureComm, DSL Data, and Encryptcomm.

106. The criminal proceeds used to pay for PHANTOM SECURE devices and network subscriptions were proceeds of drug trafficking, import/export, and conspiracy violations of Sections 841, 846, 952, 960, 963 of Title 21, and with property involved in money laundering and conspiracy violations of Title 18, United States Code, Section 1956, and obstruction of justice violations of Title 18, United States Code, Section 1512(c), and Title 18, United States Code, Section 371 conspiracy to commit obstruction of justice violations.

107. Title 18, United States Code, Sections 1956(c)(7) and 1961(1) define "specified unlawful activity" to include violations of Sections 841, 846, 952, 960, 963 of Title 21, and with property involved in money laundering and conspiracy violations of Title 18, United States Code, Section 1956, and obstruction of justice violations of Title 18, United States Code, Section 1512.

108. NASRI deducted a portion of these criminal proceeds that he received and obtained as personal profit.

109. The criminal proceeds transferred from NASRI's shell companies, SecureComm, DSL Data, and Encryptcomm to the GOLDEN CASTLE ACCOUNT constitute property involved in money laundering violations of Title 18, United States Code, Section 1956.

110. NASRI, and/or RAMOS, and/or PHANTOM SECURE members knowingly went on to further conduct financial transactions affecting interstate commerce through transfers and deposits of these criminal proceeds of specified unlawful activity, (that is violations of 21 U.S.C. §§ 841, 846, 952, 960, 963, and 18 U.S.C. §§ 1956 and 1512), from accounts he held for his shell companies, SecureComm, DSL Data, and Encryptcomm, to the GOLEN CASTLE ACCOUNT knowing that the transaction was designed in whole and in part to conceal and disguise, the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, and that while conducting these transfers

and deposits, NASRI, and/or RAMOS, and/or PHANTOM SECURE members knew that the property represented the proceeds of some form of unlawful activity. Such financial transactions were conducted in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and (h).

111. NASRI, and/or RAMOS, and/or PHANTOM SECURE members also knowingly went on to further conduct financial transactions affecting interstate commerce through transfers and deposits of these criminal proceeds of specified unlawful activity, (that is violations of 21 U.S.C. §§ 841, 846, 952, 960, 963, and 18 U.S.C. §§ 1956 and 1512), from accounts he held for his shell companies, SecureComm, DSL Data, and Encryptcomm to the GOLDEN CASTLE ACCOUNT with the intent to promote the carrying on of specified unlawful activity, including drug trafficking, import/export, and conspiracy violations of Sections 841, 846, 952, 960, 963 of Title 21, and money laundering and conspiracy violations of Title 18, United States Code, Section 1956, and obstruction of justice violations of Title 18, United States Code, Section 1512, and while conducting these transfers and deposits, NASRI, and/or RAMOS, and/or PHANTOM SECURE members knew that the property represented the proceeds of some form of unlawful activity. Such financial transactions were conducted in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and (h).

112. **GOLDEN CASTLE ACCOUNT.** For example, between November 2014 and July 2018, NASRI's GOLDEN CASTLE ACCOUNT received over $19,000,000 in deposits of criminal proceeds that were made through 233 wire transfers from accounts controlled by NASRI's shell companies, SecureComm, DSL Data, and Encryptcomm.

113. The average wire transfer was made in amount over $85,000.

114. For the lifecycle of the GOLDEN CASTLE ACCOUNT, the transfers from SecureComm, DSL Data, and Enrcyptcomm comprised all of the deposits into the GOLDEN CASTLE ACCOUNT.

//

//

**M.     NASRI & PHANTOM SECURE Moved Over $2.6 Million In Criminal Proceeds From GOLDEN CASTLE ACCOUNT To YOUNES NASRI ACCOUNT**

115.   The criminal proceeds transferred from NASRI's GOLDEN CASTLE ACCOUNT to NASRI's YOUNES NASRI ACCOUNT constitute criminal proceeds obtained from and traceable to violations of Title 21, United States Code, Sections 841, 846, 952, 960, and 963 (Drug Trafficking, Import/Export, and Conspiracy), and Title 18, United States Code, Section 1512(c) (Obstruction of Justice), and Title 18, United States Code, Section 371 (Conspiracy to Commit Obstruction of Justice), and Title 18, United States Code, Sections 1956 and 1956(h) (Money Laundering and Conspiracy).

116.   The criminal proceeds transferred from NASRI's GOLDEN CASTLE ACCOUNT to NASRI's YOUNES NASRI ACCOUNT constitute property involved in money laundering violations of Title 18, United States Code, Section 1956.

117.   NASRI, and/or RAMOS, and/or PHANTOM SECURE members knowingly went on to further conduct financial transactions affecting interstate commerce through transfers and deposits of these criminal proceeds of specified unlawful activity, (that is violations of 21 U.S.C. §§ 841, 846, 952, 960, 963, and 18 U.S.C. §§ 1956 and 1512), from the NASRI's GOLEN CASTLE ACCOUNT to NASRI's YOUNES NASRI ACCOUNT knowing that these transactions were designed in whole and in part to conceal and disguise, the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, and that while conducting these transactions, NASRI, and/or RAMOS, and/or PHANTOM SECURE members knew that the property represented the proceeds of some form of unlawful activity. Such financial transactions were conducted in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and (h).

118.   NASRI, and/or RAMOS, and/or PHANTOM SECURE members also knowingly went on to further conduct financial transactions affecting interstate commerce through transfers and deposits of these criminal proceeds of specified unlawful activity, (that is violations of 21 U.S.C. §§ 841, 846, 952, 960, 963, and 18 U.S.C. §§ 1956 and

1512), from NASRI's GOLDEN CASTLE ACCOUNT to NASRI's YOUNES NASRI ACCOUNT with the intent to promote the carrying on of specified unlawful activity, including drug trafficking, import/export, and conspiracy violations of Sections 841, 846, 952, 960, 963 of Title 21, and money laundering and conspiracy violations of Title 18, United States Code, Section 1956, and obstruction of justice violations of Title 18, United States Code, Section 1512, and while conducting these transactions, NASRI, and/or RAMOS, and/or PHANTOM SECURE members knew that the property represented the proceeds of some form of unlawful activity. Such financial transactions were conducted in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and (h).

119. **YOUNES NASRI ACCOUNT**. For example, between November 2014 and July 2018, approximately $2,601,804.15 in criminal proceeds were transferred from NASRI's GOLDEN CASTLE ACCOUNT into NASRI's YOUNES NASRI ACCOUNT.

120. For the lifecycle of the YOUNES NASRI ACCOUNT, the transfers from the GOLDEN CASTLE ACCOUNT comprised all of the deposits into the YOUNES NASRI ACCOUNT.

**N. Criminal Proceeds Continued To Be Laundered & Transferred To RAMOS As Over $5.2 Million In Criminal Proceeds Moved From NASRI's GOLDEN CASTLE ACCOUNT To RAMOS' PHANTOM SECURE TECHNOLOGY 5032 IRISH ACCOUNT**

121. **PHANTOM SECURE TECHNOLOGY 5032 IRISH ACCOUNT.** The PHANTOM SECURE TECHNOLOGY 5032 IRISH ACCOUNT was an account under number IE49AIBK93338488125032 that RAMOS held in the name of Vincent Ramos and/or Phantom Secure Technology Ltd at Allied Irish Banks Plc. in Ireland.

122. The criminal proceeds transferred from NASRI's GOLDEN CASTLE ACCOUNT to RAMOS' PHANTOM SECURE TECHNOLOGY 5032 IRISH ACCOUNT constitute criminal proceeds obtained from and traceable to violations of Title 21, United States Code, Sections 841, 846, 952, 960, and 963 (Drug Trafficking, Import/Export, and Conspiracy), and Title 18, United States Code, Section 1512(c)

(Obstruction of Justice), and Title 18, United States Code, Section 371 (Conspiracy to Commit Obstruction of Justice), and Title 18, United States Code, Sections 1956 and 1956(h) (Money Laundering and Conspiracy).

123. The criminal proceeds transferred from NASRI's YOUNES NASRI ACCOUNT to RAMOS' PHANTOM SECURE TECHNOLOGY 5032 IRISH ACCOUNT constitute property involved in money laundering violations of Title 18, United States Code, Section 1956.

124. NASRI, and/or RAMOS, and/or PHANTOM SECURE members knowingly went on to further conduct financial transactions affecting interstate commerce through transfers and deposits of these criminal proceeds of specified unlawful activity, (that is violations of 21 U.S.C. §§ 841, 846, 952, 960, 963, and 18 U.S.C. §§ 1956 and 1512), from NASRI's GOLEN CASTLE ACCOUNT to RAMOS' PHANTOM SECURE TECHNOLOGY 5032 IRISH ACCOUNT knowing that the transaction was designed in whole and in part to conceal and disguise, the nature, location, source, ownership, and control of the proceeds of said specified unlawful activities, and that while conducting these transfers and deposits, NASRI, and/or RAMOS, and/or PHANTOM SECURE members knew that the property represented the proceeds of some form of unlawful activity. Such financial transactions were conducted in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and (h).

125. NASRI, and/or RAMOS, and/or PHANTOM SECURE members also knowingly went on to further conduct financial transactions affecting interstate commerce through transfers and deposits of these criminal proceeds of specified unlawful activity, (that is violations of 21 U.S.C. §§ 841, 846, 952, 960, 963, and 18 U.S.C. §§ 1956 and 1512), from NASRI's GOLDEN CASTLE ACCOUNT to RAMOS' PHANTOM SECURE TECHNOLOGY 5032 IRISH ACCOUNT with the intent to promote the carrying on of specified unlawful activity, including drug trafficking, export/import, and conspiracy violations of Sections 841, 846, 952, 960, 963 of Title 21, and money laundering and conspiracy violations of Title 18, United States Code, Section 1956, and

obstruction of justice violations of Title 18, United States Code, Section 1512, and while conducting these transactions, NASRI, and/or RAMOS, and/or PHANTOM SECURE members knew that the property represented the proceeds of some form of unlawful activity. Such financial transactions were conducted in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and (h).

126. **RAMOS' PHANTOM SECURE TECHNOLOGY 5032 IRISH ACCOUNT.** For example, between June 2, 2015 and May 23, 2016, approximately €5,233,542.34 in criminal proceeds were transferred through 47 wire transfers from NASRI's GOLDEN CASTLE ACCOUNT into RAMOS' PHANTOM SECURE TECHNOLOGY 5032 IRISH ACCOUNT.

127. For the lifecycle of the PHANTOM SECURE TECHNOLOGY 5032 IRISH ACCOUNT, the GOLDEN CASTLE ACCOUNT comprised over 99% of the total deposits into the Phantom Secure Technology 5032 Account.

128. As part of RAMOS' criminal conviction, RAMOS agreed to and was ordered to forfeit, among numerous other seized assets, all money, funds and credits on deposit in the PHANTOM SECURE TECHNOLOGY 5032 IRISH ACCOUNT.

129. RAMOS used these criminal proceeds to promote the specified unlawful activity, for example, by paying approximately $200,000 per month for SIM cards for the PHANTOM SECURE devices.

130. RAMOS also used these criminal proceeds to promote the specified unlawful activity, for example, by paying tens of thousands of dollars each month to cover the PHANTOM SECURE server expenses.

131. RAMOS further used these criminal proceeds to promote the specified unlawful activity, for example, by paying through regular payroll the four office staff persons RAMOS said he employed to run the PHANTOM SECURE office in Canada.

//

//

//

**O.    Criminal Proceeds Continued To Be Laundered & Transferred To RAMOS As Over $6.8 Million In Criminal Proceeds Moved From NASRI's GOLDEN CASTLE ACCOUNT To RAMOS' PHANTOM SECURE TECHNOLOGY 3263 IRISH ACCOUNT**

132.   **PHANTOM SECURE TECHNOLOGY 3263 IRISH ACCOUNT.** The PHANTOM SECURE TECHNOLOGY 3263 IRISH ACCOUNT was an account under number IE39AIBK93006726793263 that RAMOS held in the name of Vincent Ramos and/or Phantom Secure Technology Ltd at Allied Irish Banks Plc. in Ireland.

133.   The criminal proceeds transferred from NASRI's GOLDEN CASTLE ACCOUNT to RAMOS' PHANTOM SECURE TECHNOLOGY 5032 IRISH ACCOUNT constitute criminal proceeds obtained from and traceable to violations of Title 21, United States Code, Sections 841, 846, 952, 960, and 963 (Drug Trafficking, Import/Export, and Conspiracy), and Title 18, United States Code, Section 1512(c) (Obstruction of Justice), and Title 18, United States Code, Section 371 (Conspiracy to Commit Obstruction of Justice), and Title 18, United States Code, Sections 1956 and 1956(h) (Money Laundering and Conspiracy).

134.   The criminal proceeds transferred from NASRI's YOUNES NASRI ACCOUNT to RAMOS' PHANTOM SECURE TECHNOLOGY 3263 IRISH ACCOUNT constitute property involved in money laundering violations of Title 18, United States Code, Section 1956.

135.   NASRI, and/or RAMOS, and/or PHANTOM SECURE members knowingly went on to further conduct financial transactions affecting interstate commerce through transfers and deposits of these criminal proceeds of specified unlawful activity, (that is violations of 21 U.S.C. §§ 841, 846, 952, 960, 963, and 18 U.S.C. §§ 1956 and 1512), from NASRI's GOLEN CASTLE ACCOUNT to RAMOS' PHANTOM SECURE TECHNOLOGY 3263 IRISH ACCOUNT knowing that the transaction was designed in whole and in part to conceal and disguise, the nature, location, source, ownership, and control of the proceeds of said specified unlawful activities, and that while conducting

these transfers and deposits, NASRI, and/or RAMOS, and/or PHANTOM SECURE members knew that the property represented the proceeds of some form of unlawful activity. Such financial transactions were conducted in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and (h).

136.   NASRI, and/or RAMOS, and/or PHANTOM SECURE members also knowingly went on to further conduct financial transactions affecting interstate commerce through transfers and deposits of these criminal proceeds of specified unlawful activity, (that is violations of 21 U.S.C. §§ 841, 846, 952, 960, 963, and 18 U.S.C. §§ 1956 and 1512), from NASRI's GOLDEN CASTLE ACCOUNT to RAMOS' PHANTOM SECURE TECHNOLOGY 3263 IRISH ACCOUNT with the intent to promote the carrying on of specified unlawful activity, including drug trafficking, import/export, and conspiracy violations of Sections 841, 846, 952, 960, 963 of Title 21, and money laundering and conspiracy violations of Title 18, United States Code, Section 1956, and obstruction of justice violations of Title 18, United States Code, Section 1512, and while conducting these transactions, NASRI, and/or RAMOS, and/or PHANTOM SECURE members knew that the property represented the proceeds of some form of unlawful activity. Such financial transactions were conducted in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and (h).

137.   **PHANTOM SECURE TECHNOLOGY 3263 IRISH ACCOUNT.** For example, between May 10, 2016 and February 2, 2018, approximately $6,858,601.72 in criminal proceeds were transferred in 43 wire transfers from NASRI's GOLDEN CASTLE ACCOUNT into RAMOS' PHANTOM SECURE TECHNOLOGY 3263 IRISH ACCOUNT.

138.   For the lifecycle of the PHANTOM SECURE TECHNOLOGY 3263 IRISH ACCOUNT, the GOLDEN CASTLE ACCOUNT comprised over 91% of the total deposits into the PHANTOM SECURE TECHNOLOGY 5032 IRISH ACCOUNT.

139.   As part of RAMOS' criminal conviction, RAMOS agreed to and was ordered to forfeit, among numerous other seized assets, all money, funds and credits on deposit in

36

the PHANTOM SECURE TECHNOLOGY 3263 IRISH ACCOUNT.

140.   RAMOS used these criminal proceeds to promote the specified unlawful activity, for example, by paying approximately $200,000 per month for SIM cards for the PHANTOM SECURE devices.

141.   RAMOS also used these criminal proceeds to promote the specified unlawful activity, for example, by paying tens of thousands of dollars each month to cover the PHANTOM SECURE server expenses.

142.   RAMOS further used these criminal proceeds to promote the specified unlawful activity, for example, by paying via regular payroll the four office staff persons RAMOS said he employed to run the PHANTOM SECURE office in Canada.

## COUNT 1

**DEFENDANT $1,152,366.18 IN FUNDS FROM BENDURA BANK AG, PORTFOLIO NUMBER XX5.280, HELD IN THE NAME GOLDEN CASTLE TECHNOLOGY LIMITED**

143.   The allegations contained in paragraphs 1 through 142 above are incorporated herein by reference and included as a part hereof.

144.   The Defendants are subject to forfeiture under Title 18, United States Code, Section 981(a)(1)(A), because the Defendants constitute any property, real or personal, involved in a transaction or attempted transaction in violation of Title 18, United States Code, Sections 1956 and 1956(h) (Money Laundering and Conspiracy).

145.   The Defendants are also subject to forfeiture under Title 18, United States Code, Section 981(a)(1)(C), as any property, real or personal, which constitutes or are derived from proceeds traceable to violations of any offense constituting a "specified unlawful activity" under Title 18, United States Code, Sections 1956(c)(7) and 1961(1), or a conspiracy to commit such offense, including Title 18, United States Code, Sections 1956 and 1956(h) (Money Laundering and Conspiracy), and violations of Title 21, United States Code, Sections 841, 846, 952, 960, and 963 (Drug Trafficking, Import/Export, and Conspiracy), and Title 18, United States Code, Section 1512(c) (Obstruction of Justice),

1  and Title 18, United States Code, Section 371 (Conspiracy to Commit Obstruction of
2  Justice).

3      146.   The Defendants are further subject to forfeiture under Title 21, United States
4  Code, Section 881(a)(6), as all moneys, negotiable instruments, securities, or other things
5  of value furnished or intended to be furnished by any person in exchange for a controlled
6  substance or listed chemical in violation of Subchapter I, Chapter 13 of Title 21, all
7  proceeds traceable to such exchange, and all moneys, negotiable instruments, and
8  securities, used or intended to be used to facilitate any violation of Subchapter I, Chapter
9  13 of Title 21, including violations of Title 21, United States Code, Sections 841, 846, 952,
10  960, and 963 (Drug Trafficking, Import/Export, and Conspiracy).

11  

**COUNT 2**

**DEFENDANT $53,020.18 IN FUNDS FROM BENDURA BANK AG PORTFOLIO**

**NUMBER XX3.200, HELD IN THE NAME YOUNES NASRI**

14      147.   The allegations contained in paragraphs 1 through 142 above are incorporated
15  herein by reference and included as a part hereof.

16      148.   The Defendants are subject to forfeiture under Title 18, United States Code,
17  Section 981(a)(1)(A), because the Defendants constitute any property, real or personal,
18  involved in a transaction or attempted transaction in violation of Title 18, United States
19  Code, Sections 1956 and 1956(h) (Money Laundering and Conspiracy).

20      149.   The Defendants are also subject to forfeiture under Title 18, United States
21  Code, Section 981(a)(1)(C), as any property, real or personal, which constitutes or are
22  derived from proceeds traceable to violations of any offense constituting a "specified
23  unlawful activity" under Title 18, United States Code, Sections 1956(c)(7) and 1961(1), or
24  a conspiracy to commit such offense, including Title 18, United States Code, Sections 1956
25  and 1956(h) (Money Laundering and Conspiracy), and violations of Title 21, United States
26  Code, Sections 841, 846, 952, 960, and 963 (Drug Trafficking, Import/Export, and
27  Conspiracy), and Title 18, United States Code, Section 1512(c) (Obstruction of Justice),
28  //

and Title 18, United States Code, Section 371 (Conspiracy to Commit Obstruction of Justice).

150.   The Defendants are further subject to forfeiture under Title 21, United States Code, Section 881(a)(6), as all moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of Subchapter I, Chapter 13 of Title 21, all proceeds traceable to such exchange, and all moneys, negotiable instruments, and securities, used or intended to be used to facilitate any violation of Subchapter I, Chapter 13 of Title 21, including violations of Title 21, United States Code, Sections 841, 846, 952, 960, and 963 (Drug Trafficking, Import/Export, and Conspiracy).

**WHEREFORE**, the United States prays that due process issue to enforce the forfeiture of the Defendants and that due notice be given to all interested parties to appear and show cause why said forfeiture should not be declared, that the Defendants be condemned as forfeited to the United States to be disposed of according to law, and for such other relief as this Court may deem just and proper.

DATED: June 21, 2021

RANDY S. GROSSMAN
Acting United States Attorney

s/DAVID J. RAWLS
DAVID J. RAWLS
Assistant U.S. Attorney